**John DOE, Plaintiff–Appellant,**

v.

**The UNITED STATES, Defendant–Appellee.**

No. 96–5108.

United States Court of Appeals, Federal Circuit.

Dec. 30, 1997.

Guy James Ferrante, King & Everhard, P.C., Falls Church, VA, argued, for Plaintiff–Appellant.

John S. Groat, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, argued, for Defendant–Appellee. With him on the brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and James M. Kinsella, Assistant Director. Of counsel on the brief was Lt. Col. Steve Pecinovsky, Dept. of the Air Force, Office of the Judge Advocate General, Arlington, VA.

Before MICHEL, Circuit Judge, ARCHER, Senior Circuit Judge,* and PLAGER, Circuit Judge.

PLAGER, Circuit Judge.

Based on a charge of having sexually molested his teenage daughter on a camping trip in 1981, Major John Doe[1] was discharged seven years later from the United States Air Force with an "other than honorable" discharge. After exhausting his administrative remedies with the Air Force, Major Doe sued in the United States Court of Federal Claims for the back pay, both active and retired, that he would have earned had he not been discharged, wrongfully in his view, and for correction of his military record. The Court of Federal Claims granted summary judgment for the United States, upholding the Air Force's action.[2]

Because Major Doe's discharge was accomplished through the use of hearsay evidence wrongfully obtained by Government lawyers in direct violation of a state court order, as a result of which Major Doe was denied the opportunity to effectively challenge the hearsay evidence, and because even if the evidence were untainted it was too insubstantial to provide a valid basis for the disciplinary action taken against him, we reverse and remand with instructions.

---

* Senior Circuit Judge Glenn L. Archer, Jr. vacated the position of Chief Judge on December 24, 1997.

1. At the plaintiff's urging, given the sensitive nature of this case, the trial court entered a Protective Order prohibiting the disclosure of the plaintiff's name or those of his family. We con-tinue to honor that order by using pseudonyms in the present opinion to protect the identity of the plaintiff and his family.

2. The trial court's opinion is reported as *Doe v. United States*, 35 Fed. Cl. 85 (1996).

## BACKGROUND

At the time of his discharge, Major Doe had an exemplary and distinguished military career. He had accumulated over 14 years of active-duty service, including a brief tour of duty in Korea and nearly a year in Vietnam, where he flew 179 combat missions and 13 combat support missions. Among the several medals he was awarded was the Distinguished Flying Cross.

The operative events in the case occurred between 1981 and 1987. During part of this time, from 1979 to 1984, Major Doe, an aerospace physiologist, held a duty assignment as an instructor in biology at the Air Force Academy in Colorado Springs. He was later assigned to Brooks AFB in Texas, from where he was discharged.

The facts, stripped to their essentials, can be briefly stated. The Does had a teenage daughter, Jane Doe, living at home. The record establishes that Jane was an emotionally disturbed child, who, according to her mother's statement, was rebellious, experimenting with drugs, and associating with a group of young people of whom her parents disapproved. In March 1982, Jane was hospitalized following an apparent suicide attempt. During the course of her hospitalization, Jane allegedly told one of the doctors treating her that, on a camping trip that they had taken together the preceding year, her father, Major Doe, had sexually molested her.

Subsequently, a Colorado Department of Social Services ("DSS") employee, Marsha Nicoll, interviewed Jane. Ms. Nicoll prepared a report of the case, including the substance of the interview, and sent it to the local district attorney's office. This report became known as the 'transfer summary.' The district attorney's office sent a copy of the 'transfer summary' to the Air Force Office of Special Investigations ("OSI").

Later that month the El Paso County District Court, to whom the matter had been referred by the local authorities, issued, on motion of Jane's guardian *ad litem*, a Protective Order restricting access to all records of the case, including the DSS records. Under the Order, access to the records was limited to the parties, the DSS, and authorized court personnel.

Meanwhile, an officer of the El Paso County Sheriff's Department, Deanna Olmstead, was conducting her own investigation. In April 1982, in response to an inquiry from OSI, Ms. Olmstead sent OSI a report that described two conversations Ms. Olmstead allegedly had with Major Doe's attorney in the matter, and enclosed, in violation of the District Court Order, a copy of the 'transfer summary.' This report became known as the 'sheriff's report.' OSI then sent a copy of the 'sheriff's report' to the Superintendent of the Air Force Academy.

More than a year later, in August 1983, a representative of the Air Force moved to intervene in the District Court proceedings so as to gain access to the records in the case. That motion was denied in October 1983.

After another year or so had passed, in January 1985 the Air Force, through its attorney Major Joseph Traficanti, renewed its motion, requesting that the restriction Order be set aside so that the Air Force could obtain evidence it needed in order to determine Major Doe's continued fitness as an Air Force officer. The District Court, after hearing and considering both the Air Force's concerns and the need to protect the family unit and members while the matter remained sub judice, issued an amended Order essentially denying the Air Force request. The amended Order reaffirmed the earlier Order, and in addition specifically enjoined all representatives of DSS and the Sheriff's Department, as well as hospital personnel, from releasing any further information about the case to anyone outside the court's own agencies. In a colloquy with Major Traficanti in the course of the hearing on the matter, the District Court granted the Air Force a small concession—the Air Force could ask DSS and the Sheriff's Department one and only one question: "Is this [the 'transfer summary' and the 'sheriff's report'] an authentic document from your Department?"

The Air Force's need for getting access to the records in the case arose from discharge proceedings the Air Force had initiated against Major Doe. Specifically, in 1983, Ma-

jor Doe was instructed to "show cause" why he should be retained on active duty in light of information that had been placed in his official file. This proceeding was terminated in February 1984, presumably for lack of evidence to support it.

Then, in January 1986, Major Doe was again notified that he would be required to "show cause" why he should be retained on active duty. This time a Board of Inquiry was convened to consider the question. During the proceedings before the Board, the presiding judge (known as the Legal Advisor) ruled that the purported statements of Jane Doe contained in the 'transfer summary' were inadmissible: "[t]his is hearsay upon hearsay and I find that there are no adequate safeguards for the truth of the statements of [Jane Doe] to Ms. Nicholl [sic]."[3] With the 'transfer summary' inadmissible, the portions of the 'sheriff's report' attributable to Jane were also ruled inadmissible.

Rather than terminating the proceedings as was done in 1984, the Air Force permitted the Board proceedings to be continued in order to allow the Government to better support its case, specifically "to bolster indicia of reliability surrounding [Jane Doe]'s statement." The prosecuting attorney (called a Recorder), in arguing for a continuance, admitted that the Legal Advisor's ruling had "taken away the main part of the government's case."

At the request of Air Force officials in Texas, where Major Doe was now stationed, Major Traficanti, accompanied by Major Richard Bowers, another Air Force attorney, returned to Colorado Springs. There, with the assistance of an attorney from the local district attorney's office, and in direct violation of the District Court's Protective Order, which they all knew was still in effect, Major Traficanti and Major Bowers interviewed the DSS employee, Ms. Nicoll, and the Sheriff's Department investigator, Ms. Olmstead. These interviews were conducted without knowledge of, or participation by representatives of, Major Doe, Jane Doe or the District Court. The interviews focused on the recol-

lections of the two witnesses regarding the events of some four years earlier, and reaffirmed that the witnesses meant what they said in the respective 'transfer summary' and 'sheriff's report.'

The Board of Inquiry reconvened in July 1986. The Legal Advisor ruled that transcripts of the interviews obtained in Colorado now made the 'transfer summary' admissible as proof of the facts contained therein, and with it the 'sheriff's report.' Major Doe's counsel protested that, in addition to the fact that the interviews added nothing of substance to the record, they had been conducted *ex parte* under highly prejudicial circumstances. Because he was duty bound to respect the Order of the District Court and not contact either of the persons interviewed (or any others covered by the Order), there could be no opportunity for him to effectively challenge the witnesses' statements.

Counsel's objection was unavailing; on the basis of the "new" record before it, the Board recommended that Major Doe be given an Under Other Than Honorable Conditions discharge. On February 13, 1987, the Board's recommendation was implemented by the Air Force. Over the dissent of one panel member, subsequent efforts by Major Doe to obtain relief from the Air Force Board for the Correction of Military Records were equally unavailing.

Major Doe filed a claim under the Tucker Act in the United States Court of Federal Claims, requesting back pay from the date of his discharge through March 31, 1992, and retirement pay from April 1, 1992, the date when plaintiff was originally scheduled to retire, to the present. Major Doe also sought to require the Secretary of the Air Force to correct his military records. The United States moved for and was granted summary judgment. *See Doe v. United States*, 35 Fed. Cl. 85 (1996). This appeal followed.

## DISCUSSION

Judicial review of an administrative decision to discharge a military officer is

---

**3.** AFR 11–31, 3a(4), provides: "Hearsay evidence is admissible provided the Legal Advisor determines that there is adequate safeguard for truth."

limited. When a branch of the armed forces has made a decision concerning who is or who is not fit to serve, that decision is generally entitled to great deference. *See Orloff v. Willoughby,* 345 U.S. 83, 90, 73 S.Ct. 534, 538-39, 97 L.Ed. 842 (1953); *Maier v. Orr,* 754 F.2d 973, 984 (Fed.Cir.1985). That being said, "men and women in the Armed Forces do not leave constitutional safeguards and judicial protection behind when they enter the military service." *Weiss v. United States,* 510 U.S. 163, 194, 114 S.Ct. 752, 769, 127 L.Ed.2d 1 (1994) (Ginsburg, J., concurring). However, to prevail, a plaintiff must "overcome the strong, but rebuttable, presumption that administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith." *Sanders v. United States,* 219 Ct.Cl. 285, 594 F.2d 804, 813 (1979) (citations omitted).

■ It is established law that a trial court in reviewing an administrative decision affecting military pay applies the traditional administrative standard: the decision will be upheld unless it is "arbitrary, capricious, or in bad faith, or unsupported by substantial evidence, or contrary to law." *Heisig v. United States,* 719 F.2d 1153, 1156 (Fed.Cir. 1983); *Clayton v. United States,* 225 Ct.Cl. 593, 595, 1980 WL 13179 (1980); *see also Chappell v. Wallace,* 462 U.S. 296, 303, 103 S.Ct. 2362, 2367, 76 L.Ed.2d 586 (1983). On appeal to this court, we do not review directly the administrative decision but rather we review the judgment of the trial court, applying the usual clear error standard for fact finding and independent review standard for questions of law. *Heisig,* 719 F.2d at 1158. We conclude that Major Doe has satisfied his heavy burden in this case of establishing that the decision to discharge him is not supported by substantial evidence, and that in holding otherwise the trial court erred.

Zeal and persistence on the part of Government officials in the pursuit of truth and justice is to be acclaimed; abuse of the law and of legal process, and disregard by officialdom of a citizen's basic rights, is to be condemned. There can be no doubt that the Government's lawyers, Majors Traficanti and Bowers, were in direct violation of the Order of the District Court when they undertook to interview Ms. Nicoll and Ms. Olmstead. Indeed, Ms. Nicoll and Ms. Olmstead were subsequently tried and found in contempt of court for their part in the interviews.

Majors Traficanti and Bowers, also confronted with a contempt show cause order from the state District Court, had the matter removed to the local federal district court. There they agreed to pretrial diversion—they presented a seminar on the "interface" between civilian courts and military activities in exchange for the dismissal of all charges. That the federal district court for whatever reason could be said to have treated the matter lightly does not excuse the misconduct, nor cure the problem created.

■ Even assuming the evidence thus obtained is admissible in an administrative proceeding,[4] it falls singularly short of the "substantial evidence" needed to support Major Doe's discharge. The rule that hearsay evidence can be the "substantial evidence" required to support an administrative decision derives from *Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). That case involved the denial of social security benefits, a denial based on medical records. In upholding the denial of benefits in that case, the Supreme Court was careful to articulate the underlying factors that led to and supported its decision.

First, the Court noted that each of the hearsay reports was prepared by a physician who had actually examined the claimant. *Id.* at 402, 91 S.Ct. at 1427-28. In contrast, the 'transfer summary,' while presuming to reflect Ms. Nicoll's observations, also included statements allegedly made to Ms. Nicoll by Jane Doe, so-called "double-hearsay." The 'sheriff's report' is yet a third level of hearsay because it relies on the 'transfer summary.'

---

4. In view of our disposition of the case, we need not address the Constitutional issues raised by the admission into evidence of matter obtained in the manner described. *Compare I.N.S. v. Lopez-*

*Mendoza,* 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984) *with Orhorhaghe v. I.N.S.,* 38 F.3d 488 (9th Cir.1994).

Second, the Supreme Court justified its decision based on "the [Social Security] system's administrative structure and procedures, with essential determinations numbering into the millions ... of a size and extent difficult to comprehend." *Id.* at 399, 91 S.Ct. at 1426. The Court went on to describe the system's "emphasis upon the informal rather than the formal," with procedures that "should be liberal and not strict in tone and operation. This is the obvious intent of Congress so long as the procedures are fundamentally fair." *Id.* at 400–401, 91 S.Ct. at 1427. Certainly, no such justification exists in this case. Though there may be a large number of military personnel on active duty, the disciplinary discharge of a senior officer after years of faithful service is not an informal routine matter, and in fact is governed by elaborate procedures as evidenced by this case.

Several of the other factors relied on by the Court in *Perales* involved the nature of the hearsay itself. With regard to the medical records, the Court noted: "the specter of questionable credibility and veracity is not present; there is professional disagreement with the medical conclusions, to be sure, but there is no attack here upon the doctors' credibility or veracity." *Id.* at 407, 91 S.Ct. at 1430. By contrast, neither the 'transfer summary' nor the 'sheriff's report' can be considered inherently reliable. In fact, just the opposite is true. The purported statements at issue were allegedly made by a disturbed child while under observation in a psychiatric ward of a hospital. It is difficult to imagine hearsay evidence that would be more open to attack on the grounds of credibility and veracity.

Two other factors considered significant in *Perales* were the extent of the testing and the consistency of the reports. *Id.* at 404, 91 S.Ct. at 1428–29. In this case, only the 'transfer summary' was based on purportedly first-hand information. The 'sheriff's report' merely parroted the 'transfer summary' in

pertinent part. In such a case, any apparent consistency is hardly an indicia of reliability.

Finally, and most importantly, the claimant in *Perales* had the opportunity to subpoena the witnesses and to cross-examine them. As the Court specifically observed, "the authors of those reports were known and were subject to subpoena and to ... cross-examination." *Id.* at 407, 91 S.Ct. at 1430. Several circuit courts have emphasized this factor and have held that hearsay is not substantial evidence when there is no such opportunity to cross-examine the witnesses. *See, e.g., Townley v. Heckler,* 748 F.2d 109, 114 (2d Cir.1984) ("[A] disability benefits claimant has a right to cross examine the author of an adverse report and to present rebuttal evidence."); *Wallace v. Bowen,* 869 F.2d 187, 191–92 (3d Cir.1989) ("We construe [*Perales*] as holding that an opportunity for cross-examination is an element of fundamental fairness of the hearing to which a claimant is entitled...."); *Coffin v. Sullivan,* 895 F.2d 1206, 1212 (8th Cir. 1990) ("Due process requires that a claimant be given the opportunity to cross-examine and subpoena the individuals who submit reports." (citing *Perales* )); *Lidy v. Sullivan,* 911 F.2d 1075, 1077 (5th Cir.1990) (noting that "all of the circuit courts of appeals that have addressed this issue read *Perales* as conferring an absolute right to subpoena a reporting physician").

As previously noted, in this case Major Doe was precluded even from interviewing the authors of the two reports because of the Protective Order, much less given the opportunity to subject them to subpoena and cross-examination. It would seem perverse indeed if Major Doe is penalized for obeying the law, while the United States Government, through its attorneys, is rewarded for flaunting it.

The evidence in the Air Force's case against Major Doe consisted solely of the alleged statement of his daughter as reported by Ms. Nicoll in the 'transfer summary' document.[5] Jane's mother, sometime after

5. We give no credence to the statement by Sheriff's investigator Ms. Olmstead, contained in her report, that Major Doe's lawyer, in a passing conversation, told her that Major Doe had admitted to his attorney that he (Major Doe) was guilty

of the offense. In addition to the improbability that the lawyer would casually breach his duty of confidentiality to his client in that manner, the attorney subsequently swore under oath that he

the Does had divorced (apparently for reasons unrelated to the Jane Doe matter), characterized the Air Force's attempts to discharge her ex-husband as a "witch hunt based on a questionable statement badgered out of an emotionally disturbed teenager."

When the Board of Inquiry first convened in 1986, the Government submitted as evidence the 'transfer summary' and the 'sheriff's report.' As noted earlier, these were ruled inadmissible by the Legal Advisor, as "hearsay upon hearsay." How could these conclusions have changed as a result of the interviews conducted by Majors Traficanti and Bowers of the authors of the two reports? The essence of the two interviews could be little more than, "I said it then and I meant it." There was no new information, and indeed the purpose of the entire charade was to provide the Legal Advisor with a fig leaf under which he could declare that the reports now had an "adequate safeguard for truth."

There had never been any question about the authenticity of the reports, that is, that they were prepared by the two officials who signed them. As the trial court noted, the effort to further authenticate the two documents was redundant because the agencies which generated the original versions of the documents had previously provided the Government with a written certification of the authenticity of each of the Air Force's copies. Obviously the transcripts of the interviews, confirming that the documents were what they purported to be, could not magically convert what had once been unreliable and inadmissible hearsay into now reliable proof of the truth of the contents thereof.

Regarding the truth of the allegations against Major Doe, the Legal Advisor had this to say about the evidence when it was originally submitted to the Board:

> The problem I have ... is that the facts [are] consistent with so many other explanations, and there is so much evidence contained from the mother, for instance, and from the [transfer summary], that there were suicidal tendencies, and there ... were drugs involved, and there was a

psychological problem, so that there are so many explanations for that obvious trauma that [Jane] was undergoing, that are not necessarily consistent with a molestation, that I don't find that that would be adequate corroboration for the statements.

This weakness in the Government's evidence, so graphically described by the Legal Advisor, remained the problem inherent in the case, and nothing contained in the transcripts of the interviews could do anything to change it.

The trial court was of the view that the Air Force had followed the applicable discharge regulations; that when a military department has made a decision concerning who is or is not fit to serve, that decision is generally entitled to great deference; that there is a presumption that administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith; and that the focus of the court's review is on determining whether the military has properly followed discharge procedures established by statute or regulation, and not on a review of the merits of the military's decision to discharge a particular individual. In light of these considerations, the trial court concluded that the Government was entitled to summary judgment in its favor.

We cannot fault the trial court's recitation of the general rules under which courts examine decisions by the military concerning matters peculiarly within the province of the military. It is certainly true that the military retains substantial control over decisions respecting the fitness of personnel to perform their military duties. See Orloff, 345 U.S. at 90, 73 S.Ct. at 538–39; Maier, 754 F.2d at 984. Here, however, the question is not so much one of fitness for military duty— Major Doe's outstanding performance as an Air Force officer was never questioned—but rather whether he had engaged in an act that would be heinous whether committed by civilian or military.

Sexual molestation of a child, especially if committed by a child's own parent, is indeed heinous. But like other person-to-person offenses, whether the act in fact occurred,

---

had never made the statements attributed to him     by Ms. Olmstead in the 'sheriff's report.'

when there is no corroborating evidence, depends very much on the believability of the complaining witness. And though an administrative discharge proceeding is not held to the same high standard of proof as a criminal hearing, *Perales*, 402 U.S. at 402, 91 S.Ct. at 1427–28, and hearsay evidence is not as tightly controlled as it is in civil court proceedings, *id.*, nevertheless there remains a minimum level of proof that must be found in the record, *Massa v. Department of Defense*, 815 F.2d 69, 72 (Fed.Cir.1987).

By any standard, this case fails that test. The conclusion that the offense occurred is unsupported by substantial evidence; what evidence there is was obtained in a manner that effectively precluded countering by the accused. The greatest engine for truth, it has been written, is the opportunity to confront one's accusers and to cross-examine them. *See California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970) (quoting 5 J. Wigmore, Evidence § 1367, at 32 (J. Chadbourn rev.1974)). In administrative proceedings such as this, the rules are modified to permit agency processes that are less formal than those of a law court. But that does not authorize a gross departure from basic principles as has occurred in this case.

## CONCLUSION

The judgment of the trial court in favor of the Government is reversed. Judgment in favor of Major Doe is ordered. The case is remanded to the trial court to fashion an appropriate remedy, including both back pay and correction of records, such as to restore Major Doe to the position he would have been in but for the wrongful discharge.

*REVERSED* AND *REMANDED.*

## COSTS

Costs to Plaintiff–Appellant.